The first case is National Labor Relations Board versus Long Island Association for AIDS Care. Good morning, your honors. Good morning. May it please the court. My name is David Ehrlich from the law firm of Stagg, Terenzi, Confucian, and Wobnick. And I represent the Long Island Association for AIDS Care, Inc. Respond to cross petition. So this case, your honors, is about an employer making a managerial decision to discharge Marcus Acosta and Mr. Acosta and the NLRB, arguing that the discharge violated section 8A1 of the National Labor Relations Act. But to violate section 8A1 in discharging an employee, the employer had to have discharged this individual for engaging in protected concerted action. This court- What's your authority that it has to be concerted action to be a violation? Well, and- No violations happen without concerted action. What's your authority for that? Well, here, first, Ontario Knife, this is this court, Second Circuit, Justice Friendly, emphasized that the court and the board must closely adhere to the language of section 7, particularly concerted action. He was explaining that the history of the statute was based on organizing, employees wanting to create a union, picketing. So he said, this is the history. So the court and the board must adhere closely to that. To the history or to the language of the statute? To the, using the history to adhere to the language of the statute. Yes, to the language of the statute, saying it was born out of the organization. What's the language of the statute? That it, that is for the, if, what's protected is concerted activity for the mutual aid- So you're telling us that there is no precedent of this court in which a violation has been found based on other than concerted action? No, no, then there is an exception, and it deals with an overbroad policy. So now, if an employer has an overbroad policy, and the employee engages in activity that violates that policy, and the employer discharges that employee, this court, the board will say, could say, yes, this is a violation. But why? What's the purpose behind it? The purpose is to prevent the chilling of other employees engaging in protected concerted activity. It's all about if, it's all about concerted activity. One, did they engage in it, or did the employer do something to chill others? We have a case here in which the employer essentially says to its employees, you're not allowed to talk to anybody about your salaries or the working conditions or anything like that. An employee does, or an employee refuses to be bound by that, and he's fired. And you say that is not, cannot be a violation of the statute, because- Well, that's not the case here. If- Tell us what is the case. Okay, here, the employees, it's undisputed, the employees were discussing their wages, it's undisputed, management encouraged its employees to talk about working conditions. It's a progressive organization that wants to understand its employees. Is that undisputed? It was admitted to in the record by Mr. Acosta. When he was examined at the hearing, he admitted, yes, I talked to my colleagues about wages, management encouraged me. When I went to them, management said, go back and find out what other issues regarding your working conditions so I better understand it. The issue here, he was not fired for talking about wages. He was fired because he had a history of needling management, of insubordination. Is that what the fact finder found? Well, what the- Fact finder found? The fact finder found that the culminating act was signing this confidentiality statement. Refusing to sign it without, under duress. Correct. But so, the discharge was not based on his engaging in this overbroad, supposed overbroad policy. Didn't Nicoletti say to him, you just fired yourself, you just terminated yourself because he refused to sign it without under duress? He did say that, but the issue- He said that and someone else who was at the meeting from one of Mr. Acosta's, one of Lilac's witnesses also agreed that he said that. Management though, yes, but it wasn't concerted at the meeting. But the important thing here is that action did not, cannot, did not, and would not chill other employees from engaging in this action. Other employees had no idea that there was such an objection. This employee had a history of needling management. This was just the last act that he did, again, to create a problem. So- Did the confidentiality agreement forbid employees from discussing their salaries outside, discussing their salaries with other persons? It actually, no. If you look at the statute, I mean, if you look at the statement, it dealt- I'm not looking at it. Oh, okay. Tell me what I should look at. Well, the- Employees must regard all non-public information intended for internal purposes to be an agency trust. This includes, but is not limited to, dot, dot, dot, salaries, contents of employment contracts. Well, it- So they can speak- Does that tell you you're not allowed to talk about your salary? Internally you can. So the argument- Does it say that? Does it say internally? No, it's not, it doesn't use that word, but it says it's held internally for agency trust, something I'm paraphrasing. It doesn't say you're not allowed to talk about it outside? It doesn't say that? It doesn't say it's not. Well, first of all, also, these salaries are public information. They're listed, so it doesn't even apply for that. But even if it did, even if this wasn't artfully drafted, the action by the employer in this case would have no chilling effect on other employees engaging in protected concerted activity. So if there's no concerted activity, and there's no chilling of concerted activity, we're now reaching beyond what Justice Friendly said you needed to adhere to the statute. So, supposing that a group of employees wanted to say to the outside world, this employer is forbidding us from telling you, well, this employer is requiring us to work for only $7.50 an hour. Are they allowed to do that? To tell the outside world? Yes, they should be allowed to do that. They should, but does this tell them that they're not allowed to? Again, this, you can argue that it wasn't artfully drafted, but again that- Just read it and tell me, do these words tell an employee, you are not allowed to get together and carry signs declaring to the public, we're forced to work for this employer for only $7.50 an hour. Are they allowed to do that under this policy or not? According, I guess, to the language of the policy, I think, could create some ambiguity. But that wasn't the reality. Ambiguity? Where's the ambiguity? Well, I mean, saying that it was, again, I wish I had written the statement. But again, the key thing here is about the discharge. Even if it's only an ambiguity, isn't that what gives rise to a chilling effect? It would only give rise to, it could give rise to a chilling effect, but not in, certainly not in this case. Why not? Because he was not fired for engaging in that activity. He was not fired for talking about his wages. He was told that's why he was fired. He said, you just terminated yourself when you refused to sign. But that action by the employer could not chill, would not, did not, and would not chill other employees. This guy had a history of insubordination. They would ask him to do a presentation and he said, no, I'm not being paid enough. He's constantly needling management. This is allowing the board to come into our place here and tell us- You're saying the rule may well chill something he's entitled to do. But he wasn't fired for doing the thing it prohibits. He was fired only, as you view it, for not agreeing to the rule. Is that your point? For signing it under, saying under duress, and for all the other history. Isn't that, in effect, noncompliance? In effect, it's noncompliance. All right, if he does, and if the rule chills, and he won't agree to something that chills, why isn't that the end of the case? Because it wasn't going on in reality. He admitted that they were talking about their wages. The reality is, he didn't sign the rule. He didn't agree. He didn't agree. The agency needs the confidentiality statements because they deal with people, with their medical issues, and with- Medical issues have to do, the medical issues of the people they work with have to do with the salaries of the people who are employed? No, no, that was the crux, a main part of the confidentiality statement is to allow for these employees to sign confidentiality statements. Which they did. Which they did, and Mr. Acosta did the year before. And they were freely talking about their wages. Management encouraged them to talk about their wages. In the rule, it talks about the medical information of people who they work with. All I see is the working conditions, salaries, contents of employment contact, identities of contributors, staff addresses and phone numbers, internal budgets. Nothing, it doesn't even mention the thing that you say it's entirely about. I'm speaking of, I'm sorry, I'm speaking of the clients of the agency. Yes, it doesn't talk about that. It doesn't talk about keeping confidential their medical histories and so forth. No, the first two paragraphs. One relates to HIPAA and one relates to the New York statute on HIV testing. Yeah, yeah, I'm sorry, so it deals with those sensitive issues. The paragraph that we've been talking about, strictly prohibited. That's sort of strong language. Employees from disclosing information with respect to all non-public information intended for internal purposes. No, again, my focus, my main focus here is about the discharge. That the discharge was not for him, was not because Acosta engaged in that activity of talking about his wages. There was no chilling effect. Well, it looks like that's why he was fired, because he said you just terminated yourself. I don't know what was in the mind of Nicoletti when he said that, but when you look at what happened, it certainly appears that he was fired for refusing to sign. And if there are two equal factual situations, don't we defer to the NLRB in those cases? In a factual situation, but again, it's undisputed that it wasn't because he was talking about his wages. He wasn't engaging in that protected activity that all these cases say was necessary. There's an overboard policy, you engaged in the activity that was supposedly shouldn't have been prohibited, and you were fired. That could be a violation. Here, he was not engaging in that talking about wages. That wasn't the reason. It was all of these other reasons leading up to his signing under duress, further needling management. That scenario would not chill other employees. We have to stop here. You've reserved three minutes for rebuttal. Thank you very much, Your Honor. We have for the NLRB. May it please the court, Ruth Burdick, appearing from the National Labor Relations Board. From the discussion so far, I can see that the court has a very good grasp of this case. I'd like to emphasize a few points and rebuttal to the discussion that has occurred so far and my colleague's statements. The ALJ, with regards to the other reasons that they claim led up in the history, I believe is the way he characterized it. The ALJ specifically found that those reasons were contrary to the evidence presented at hearing and also, in addition, were pretextual. In other words, as a cover for the real reason for the discharge, which very clearly here, this is a very straightforward case and a very straightforward set of facts, the March 24th meeting. Nicoletti, the purpose of the meeting, Mr. Ward, who sat in on the meeting as a witness from the employer, was told previously that the purpose of the meeting was to have Mr. Acosta sign the confidentiality agreement. That was the key purpose of the meeting. That was what Mr. Nicoletti said in his threat, sign or be fired. Sign or be fired. And that's the threat that was not accepted to see board's footnote six. It wasn't disputed before the board, probably simply because it was such a clear threat. And speaking of threats, we can move then to the 8A1 context. And the language of 8A1 clearly says that employers, it's unlawful for an employer to take any conduct, which can include interrogations, statements, various different factual situations throughout the industry, that chill or interfere with employee rights. And in this context, when there's an unlawful rule, and I think that the panel understands that portion of the board's argument, the board will protect employees from their refusal to agree to that unlawful provision. Where does that come from, the rule, unlawfully overbroad rule? It comes from the Lutheran Heritage test that the board developed. There's been quite a bit of case law on upholding the rule. I believe that one of the most thorough cases to review is the Sintas case that we've cite, the DC circuit case that we cite in our brief. On the other hand, the Vanguard case of this court found an unlawful rule chilled employee exercise of rights without any evidence of enforcement, without any evidence that employees were, for instance, discussing wages. None of that was necessary. This is a facial, the unlawful rule can be unlawful on its face. And when you're looking at an explicit prohibition on exercise of employee rights, we look at the provision as if it's a contract. We look, but through the eyes of the employee, as a reasonable employee. Yes. Were either of the cases you cited to us second circuit cases? Well, the Vanguard case was the unlawful rule case that we cited. And- Second circuit case?  Which case? Vanguard? Vanguard, I believe. The assessment is based on a chilling aspect of the rule. Enforcement is not necessary. But you- Those were the- You told us the NLRB works under a rule that says an unlawfully overbroad rule is unlawful. Has the second circuit ever said that? Mr. Erla quoted a Henry Friendly decision that seemed to say something else. Well, I believe the Vanguard case says an unlawful rule is unlawful on its face. I could get you additional authority if you'd like. No, please. It's a very settled principle throughout the circuits. And I apologize if our brief was a bit thin on that. I think we consider it such a basic principle, we might not have briefed it as thoroughly as we could have. And- You're speaking in a very low voice. Oh, I'm sorry. I'll raise the mic, which might help. If I may turn to, I just want to, I didn't get a chance to respond to many of the cases that the other side filed, cited in its filed reply brief. I just want to note as a generality, in every instance where they're citing another case, they're either citing it out of context or they're citing a portion of the case that involves a different sort of 801 or 803 that does require a threshold showing of concerted activity. I don't find anything that would fall outside of those two characterizations, but I could go in more depth if you'd like. But here, I just want to emphasize that the board was authorized by Congress to make federal labor policy. And also has the ability to define the contours of section seven. And here, they found it, the board has in many cases, it's a small line of cases, but it's a different line of cases than cited by the other side, in which the board will protect an employee for And in that sense, the Denson case that the board cited protected employees from having to agree to a provision to continue employment. They would have to agree to a provision that they would work without union representation. That's a very clear case. That was one of the founding cases in this area. And the Keiser was a provision that could be read by employees as prohibiting them from filing unfair labor practice charges with the board. And whatever the factual scenario is that runs through these cases, the underlying principle is the same. And the board deals, of course, as you know, with many different factual situations and takes a look at the totality of the circumstances and evidence as a whole in making these assessments. So the principle is the same, but it's applied in many different contexts. And here, I think the context is very clear, that Mr. Acosta was fired for his refusal to agree to those portions of paragraph three and four that he signed under duress. And when he was asked in the meeting, the March 24th meeting, do you understand, sign or be fired, what is it you don't understand? Mr. Acosta actually answered. To paraphrase, he said, I do not understand why I cannot discuss these things with employees, other employees, the media, non-employees. I thought I had a right. That was the statement he made. Mr. Nicoletti said, sign or be fired again. So he signed under duress, under duress, under duress, and you have to realize he was in a meeting with two HR managers. One very upset with him, demanding he do this. Signing under duress seemed very appropriate to me. And immediately, Mr. Nicoletti said, you just terminated yourself. It's very clear that the reason he was terminated was for refusing to agree to the provisions. Unfortunately, from my perspective, there was a missed opportunity . . . . . . Did the board say that that was why he was fired? Yes. I mean, even if it were not very clear from the evidence, if the board found it and there was a basis in the evidence for finding it . . . That's correct. I wondered if the panel had any other questions about other 8A1 cases, and the concerted activity principle that he's . . . Don't. Okay. And, I just want to note that in footnote six, the board noted that the threat had not been accepted to, and the other side had a full . . . I'm sorry. The board, in footnote six of its decision, noted that the other side had not filed exceptions with regards to the threat, sign or be fired. They could have filed a motion for reconsideration with the board if they wanted to dispute that or bring anything to their attention . . . . . . which they also could have done with the board's theory stated in its first two pages of its decision. And, I see my light is almost up, and I just want to make sure that I've answered the panel's questions. You have. Okay. Well, we would like to please request that the court enforce the board's order in full. Thank you. Mr. Erhola, you have three minutes. Thank you, Your Honor. So, first . . . What is the case that you mentioned in which Judge Friendly . . . you quoted from Judge Friendly. What's the citation of that case? It's Ontario . . . Ontario? Yes. Ontario 98637 F.2D 840. And, to just rebut some of what counsel said . . . Is the case in your brief? Oh, I'm sorry? The case is not in your brief, is it? It's in our reply brief. Thank you, Your Honor. Vanguard and Syntax, those two cases, were not cited in counsel's brief. So, it doesn't give us a chance to respond. But, the cases that were cited . . . They dealt with a different issue. This is Kolkatables, Denson, Air Contact, Kaiser. Those four cases, they deal with a different issue. The issue is this . . . In those cases, the employees were involved in concerted action. The employer then said, stop. Don't do that concerted action. And, the employees said, no. I'm going to proceed. So then, the employer fired them. And, the issue that the court was deciding in those cases was . . . Was the insubordination by the employee for refusing the direction of the employer . . . Their protected rights under Section 7, because they were engaged in concerted activity. And, the court said, no. They were engaged in concerted activity. They were disciplined before their engagement in concerted activity. Therefore, there's a violation. The insubordination did not . . . The board here said concerted activity is not necessary to violate 8A. It's not necessary, only if they engaged in conduct that the overbroad rule . . . The rule that was overbroad, prohibited. Here, the rule that . . . You think Vanguard says that? You know, again, the Vanguard wasn't cited. And, I did not prepare . . . Or, at least it wasn't in the . . . I apologize for that, if it was. Well, here, the . . . Again, the . . . Whether it's the Second Circuit or the board . . . It's either you engaged in that activity or the . . . Again, it goes back to the chilling effect. Does the employer's action chill others? And, in here, in these facts with Mr. Acosta . . . And, in this situation, their action certainly did not and would not . . . Chill the other employees from engaging in this activity . . . That they were already all admitted were engaging in. And, our management encouraged. You're saying that another employee who knew all the facts of this case . . . If he wanted to keep his job, from going out and protesting the wages and working conditions? Correct. That's an interesting argument. Counsel, I have your reply brief. Yes. I don't see Vanguard. Oh, yeah. No, I didn't. That was Ontario 9th, I cited in my brief. It was Peach . . . Oh, okay. I apologize to counsel if I do see Vanguard is cited here. Where? Under the standard provisions. But, when they argued that there's this other rule . . . It's not in your brief. I'm sorry. In the red brief. Red brief. They cited it in the section dealing with the standard. But, in their section, where they say there's this other rule that expands concerted action . . . Beyond what Judge Friendly . . . Justice Friendly said it should be. It should stick . . . Adhere rather closely to the language of the statute. Concerted action. Fine. There's a little expansion, if the board expanded it. Well, if it chills. But, hasn't the NLRA, the NLRB, ruled that laws, rules that are overbroad, are unlawful? Isn't that the key? That they thought this Paragraph 3 was unlawful and it's an unfair labor practice to fire someone who doesn't comply with an unlawful rule. Well, if you look at Continental . . . You're correct, Your Honor. Thank you. If that employer . . . If that employer fired the person for engaging in that activity that was supposedly . . . Shouldn't have been prohibited. Right. So, here he didn't . . . That wasn't the reason he was fired and he was freely engaged in it. Your theory is he should assign it, even though it says don't do something, and then knowing that if he goes out and does it, he's protected by the act. Is that your theory? Isn't that just an invitation to lawlessness? Well, no. I mean, here it's . . . My theory is that this . . . The board . . . The board can't sort of stick their nose in here and change and affect our agency's personnel decision when someone is acting alone in a lone action that . . . So, it wasn't . . . He wasn't engaging . . . He wasn't fired for engaging in action that should have been prohibited. He wasn't fired for concerted action. He has this admitted, at least on the record, admitted that he needled them, that it was insubordinate, and that he did sign it, but then under duress. So, in that situation, this isn't something, as Judge Friendly said, it should deal with concerted activity or related to concerted activity. What's the level of deference we are to pay to the NORB and the ALJ in their factual findings? The way I see it is that the board is supposed to effectuate the purpose of the statute. Correct. And so here, the statute says concerted activity. They can go, as the exception, as I discussed, fine, it's not concerted activity, but it's activity that would otherwise chill other employees from concerted activity. That's sort of where it should stop. Anything beyond that, the board is now really getting into situations that it shouldn't. It should only get into situations that deal with, again, concerted activity. This is based on organizing and unions. This isn't sort of a way for a troubled, a problem employee to find a little niche and take advantage of the law. So the board could then start deciding who they should hire and fire. I think we have your argument. You've gone way over time. Thank you. Thank you both for your argument. Thank you, Your Honors. We'll reserve decision. Thank you.